**EVAN A. SCHMUTZ (3860)**
  *eschmutz@djplaw.com*
**JORDAN K. CAMERON (12051)**
  *jcameron@djplaw.com*
**DURHAM JONES & PINEGAR, P.C.**
River View Plaza, Suite 300
4844 North 300 West
Provo, Utah 84604
Telephone: (801) 375-6600
Fax: (801) 375-3865

**Attorneys for Plaintiff ZooBuh, Inc.**

UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| ZOOBUH, INC., a Utah Corporation<br><br>        Plaintiff,<br><br>vs.<br><br>TOM WILLIAMS (d/b/a EMARKETCOUPONS.COM), an individual; LEAD SERVICE GROUP, INC., a California company; WILLIAM "BILL" WAGGONER, an individual; ZEUS MEDIA, a California company; DOE-1, BELL HOLDINGS, LLC (f/k/a TECHNOLOGYADVICE, LLC) (d/b/a THRIVE MARKETING GROUP, LLC), a Tennessee limited liability company; DOES 2-40,<br><br>        Defendants. | **OPPOSITION TO DEFENDANT BELL HOLDINGS, LLC D/B/A THRIVE MARKETING GROUP'S 12(b)(2) MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION**<br><br><br><br><br><br><br><br><br><br>Case No.:  2:13cv00791 TS<br><br>Judge Ted Stewart |

COMES NOW Plaintiff ZooBuh, Inc. ("**ZooBuh**"), and submits this Opposition to

Defendant Bell Holdings, LLC d/b/a/ Thrive Marketing Group's 12(b)(2) Motion to Dismiss for

Lack of Personal Jurisdiction together with the supporting Declaration of F. Alan Fullmer and

Exhibits.

1

## Introduction

Companies such as Defendant Thrive Marketing Group, LLC ("**Thrive**") profit from continuous and repeated abuses of Federal marketing laws by targeting massive email campaigns at small Internet access services ("**IAS**") with insufficient resources to defend against such abuses.  When companies such as ZooBuh take a stand, and actively attempt to protect their businesses, they are accused of abusing the legal system and acting as litigation factories. Defendants to such actions often ineffectively cite to *Gordon v. Virtumundo*, 575 F.3d 1040 (9th Cir. 2009) to support their position.  Thrive is no exception.  *See* Memo. in Supp. Mot. Dismiss at p. 16.

However, Thrive's reliance on *Gordon v. Virtumundo* is misplaced and perfectly illustrates why it is attempting to avoid litigation in Utah under the guise of an alleged lack of jurisdiction.  Specifically, the Utah District Court has already analyzed *Gordon* with respect to ZooBuh and determined that ZooBuh is not similar to the plaintiff in *Gordon*.

In *ZooBuh v. Better Broadcasting*, the Court addressed and resolved the issue of ZooBuh's standing *sua sponte*. *See* 2013 WL 2407669, *1 (unpublished), attached hereto as Exhibit A.  In addressing standing, the Court specifically analyzed *Gordon* and held:

> The Plaintiff, ZooBuh, offers email services, blog hosting, and chat services to its customers.  ZooBuh has customers in all 50 states and in 27 different countries.  ZooBuh is widely recognized as a legitimate email provider and has been featured in various publications.  Unlike the Plaintiff in *Gordon,* ZooBuh owns, maintains and configures all the servers, routers, and switches on its network through which it hosts and provides its internet access services to its customers.  Every ZooBuh email account is registered, hosted and serviced through ZooBuh's own hardware.  ZooBuh has sole ownership of all the hardware, complete and uninhibited access to the hardware, and sole physical control over the hardware.  ZooBuh also provides each of its customers with their own web-based email portal (which ZooBuh designed, configured, and maintains) through which the ZooBuh customers access their selected web-based services (i.e., email, blogs, chat.). Accordingly, ZooBuh is a bona fide Internet access service and satisfies the first part of

the standing test under the CAN–SPAM Act.

*Id.* at *2.  In other words, the Court already analyzed the question of whether ZooBuh is a "litigation factory", and determined the ZooBuh is not.  *See id*.  ZooBuh's standing as a *bona fide* Internet access service is established as a matter of law.  *See id*.  Unlike the Plaintiff in *Gordon*, ZooBuh is a *bona fide* Internet access service entitled to avail itself of the CAN-SPAM Act.  *See id*. at *2-4.

In *ZooBuh v. Better Broadcasting*, this Court also made clear determinations and provided supporting analysis as to what constitutes violations of the CAN-SPAM Act.  *See id*.  The *Better Broadcasting* opinion is the first written opinion in any Federal District Court and in any Circuit to specifically address what constitutes violations of certain provisions of the CAN-SPAM Act.

As outlined in the corrected Second Amended Complaint, currently pending before this Court, Thrive's 30,611 commercial emails targeted at ZooBuh and received by Zoobuh at the location of its servers in Utah violate the CAN-SPAM Act in the exact ways articulated in *Better Broadcasting*.  Therefore this Court is in a unique position to address the allegations raised by ZooBuh and reach a just determination on the merits of this case, consistent with this Court's prior determination in *Better Broadcasting*.  It should be noted that neither a Federal Court in Tennessee nor in the entire 6th Circuit had occasion to substantively address the CAN-SPAM Act.

In an effort to avoid CAN-SPAM precedent in Utah, specifically as it relates to ZooBuh, Thrive Marketing Group filed a Declaratory action against ZooBuh in Tennessee ("**Tennessee Action**") and subsequently filed its motion to dismiss this Action for lack of personal

jurisdiction.  ZooBuh filed a *Motion to Dismiss or Stay* the Tennessee Action on July 30, 2014,

and submitted a copy of such to this Court as part of its *Notice of Concurrent Action and Filing

of Motion to Transfer or Dismiss*, Dkt. 105.  That Motion has been fully briefed and is still

pending.

As its only defense to jurisdiction in Utah, Thrive takes the tenuous position that because

it turned its marketing over to third parties, and turned a blind eye to their actions, it cannot be

brought into litigation in Utah, despite the fact that its publishers, at least one of which uses a

Utah address, continuously and systematically targeted and sent 30,611 commercial emails to

ZooBuh in Utah, which resulted in actual and statutory harm to ZooBuh in Utah.  However, even

if Thrive's preposterous position could be substantiated, the jurisdiction laws do not permit

companies "to hide behind the excuse of ignorance in not knowing where they or their agents

send email advertisements."  *Fenn v. Mleads Enterprises, Inc.*, 2006 UT 8, ¶ 19, 137 P.3d 706,

714 (1006).

Ironically, the CAN-SPAM Act imposes liability on companies who act as Thrive did

(i.e., blindly turning their email marketing over to third parties who violate the CAN-SPAM

Act).  *See* 15 U.S.C. §§ 7702 (12), 7706(g)(2) (extending liability to a company who turns its

email marketing over to third parties "with actual knowledge, or by consciously avoiding

knowing, whether such person is engaging, or will engage, in a pattern or practice that violates

this chapter"; *see also Asis v. Optin Global*, 2008 WL 1902217, *57 (N.D. Cal.) (unpublished)

("[t]he defendant need not have specific knowledge of the identity of the individual sending the

spam to meet the 'conscious avoidance' standard.") (stating that "conscious avoidance" can exist

where defendant claims ignorance of marketers' actions and/or where defendant decided not to

learn of its marketers actions.  *Id*. at *19), affirmed by *Asis Internet Services v. Azoogle*, Nos. 08-15979, 08-17779, 2009 WL 4841119 (9th Cir. Dec. 2, 2009) (unpublished).

Despite Thrive's somewhat convoluted analysis of jurisdiction, this case is very clear cut. Thrive, either directly or through its marketers (i.e., agents and /or representatives), continuously and systematically sent 30,611 emails to ZooBuh customers though ZooBuh's mail network in Utah, thereby causing actual and statutory injury to ZooBuh in Utah.  The law requires much less to establish jurisdiction over Thrive in Utah.

### Legal Standard

To obtain personal jurisdiction over a nonresident defendant, a plaintiff must show that jurisdiction is legitimate under the laws of the forum state and that the exercise of jurisdiction does not offend the due process clause of the Fourteenth Amendment.  *Far West Capital, Inc. v. Towne*, 46 F.3d 1071, 1074 (10th Cir. 1995).  Accordingly, Utah law governs the exercise of personal jurisdiction over Thrive, so long as it satisfies continued due process.  *See id*.; *see also Soma Med. Int'l v. Standard Chartered Bank*¸ 196 F.3d 1292, 1295 (10th Cir. 1999).

In addressing a motion to dismiss for lack of personal jurisdiction, Plaintiffs' factual allegations must be accepted as true and all reasonable inferences to be drawn from those facts must be made in the light most favorable to Plaintiffs.  *See Pohl, Inc. of Am. v. Webelhuth*, 2008 UT 89, ¶ 2, 201 P.3d 944.  Moreover, Plaintiffs are "only required to make a prima facie showing of personal jurisdiction" and "any disputes in the documentary evidence are resolved in [Plaintiffs'] favor." *Neways, Inc. v. McCausland*, 950 P.2d 420, 422 (Utah 1997) (citation omitted); *see also Hafen v. Strebeck*, 338 F. Supp. 2d 1257, 1260 (D. Utah 2004) ("All factual disputes are resolved in the favor of the plaintiff" (citation omitted)). Plaintiffs are also permitted

to bring additional evidence in support of jurisdiction. *See Roskelley & Co. v. Lerco, Inc.*, 610 P.2d 1307, 1310 (Utah 1980).

## Argument

I.     THIS COURT HAS BOTH GENERAL AND SPECIFIC JURISDICTION OVER THRIVE.

Utah law permits a Court to exercise jurisdiction over a nonresident defendant in two situations.  First, where the defendant has demonstrated "substantial and continuous local activity in the forum state" (i.e., general jurisdiction).  *Soma Med. Int'l.* 196 F.3d at 1295.  Second, where the defendant's acts or contacts implicate Utah under the Utah long-arm statute, where a nexus exists between the plaintiff's claims and the act or contacts of the defendant, and where the application of Utah's long-arm statute satisfies federal due process (i.e., specific jurisdiction). *Id.* at 1297.  In this case, the Court can exercise both general and specific jurisdiction over Thrive.

### A.  The Court has General Jurisdiction over Thrive because Thrive is engaged in substantial and continuous business in Utah.

"General Jurisdiction permits a court to exercise power over a defendant without regard to the subject of the claim asserted."  *Soma Med.* Int'l, 196 F.3d at 1295-96.  The following factors are relevant to the issue of whether general personal jurisdiction exists in Utah, "Whether the corporate defendant is . . . engaged in business in this state; . . . [or] advertising or soliciting business in this state."  *Soma Med. Int'l*, 196 F.3d at 1295-96 (citing *Buddensick v. Stateline Hotel, Inc.*, 972 P.2d 928, 930-31 (Utah Ct. App. 1998).  To find general jurisdiction, Thrive's business, advertising and/or soliciting business in Utah must be substantial and continuous.  *See id*.

Contrary to Thrive's argument, engaging in business in the state does not require that Thrive actually have employees or customers in the state.  Rather, since a major aspect of Thrive's business is to generate sales leads[1] and email lists[2], Thrive conducts its business in Utah through its efforts to generate leads and lists.  Simply because only 1% of Thrive's end user customers are in Utah (i.e., the companies who purchase the sales leads and email lists), that fact does not mean Thrive has not established substantial and continuous contact with Utah through its efforts to generate the sales leads and email lists that is sells.  Importantly, Thrive emphasizes that it does not resell another company's services.  *See* "Email Marketing", http://www.thrivemg.com/email-marketing-nashville-tennesse.php, Exhibit 8 to Fullmer Decl. In other words, Thrive generates its own leads, compiles its own email lists, and engages in its own email marketing.  Therefore Thrive essentially "manufactures" its product in Utah and many other states.  In conducting this essential part of its business, Thrive has substantial and continuous contact with Utah.

Specifically in conducting its business operations, Thrive, either directly, or through its marketing agents and representatives, directs thousand, if not millions, of emails into Utah[3], in

---

[1] With respect to its lead generation, Thrive boasts of "generating leads with much higher quality than the client's other marketing partners" and generating "1,500 sales ready leads per week. . . ." and described is business as "utilizing email . . . to generate thousands of leads . . . ."  *See* "Case Studies", http://thrivemg.com/case-studies/, attached as Exhibit 6 to Fullmer Decl.; *see also* "Email Marketing", http://thrivemg.com/email-marketing-nashville-tennesse.php, attached as Exhibit 8 to Fuller Decl.

[2] With respect to its email lists, Thrive advertises an ability to target email traffic to specific locations and advertises email lists of 10,000,000 email addresses.  *See* "Buy An Email List", http://thrivemg.com/buy-email-marketing-list.php, attached as Exhibit 7 to Fullmer Decl.

[3] As discovery has yet to be conducted, ZooBuh has only identified 30,611 email messages associated with Thrive's conducting business in Utah.  However, to date, ZooBuh has only identified one website used by Thrive to generate leads and/or gather email addresses.  Though unnecessary to the Court's determination of substantial and continuous business in this state, once discovery is made into all of the websites that Thrive owns and/or operates as part of its lead and email list generation efforts, the number of actual emails sent to ZooBuh could increase significantly.

generating sales leads and creating email lists.  Thrive boasts of its ability to "target" specific recipients by location, and has marketed itself by advertising "Free Targeting.  We'll help you find just the right segment to purchase or rent.  We can target by geographic location, interest, age, income gender, SIC code, and much more." *See id*.

Here, as part of its conducting business, Thrive sent at least 30,611 commercial email messages to ZooBuh email account holders.  *See* Decl. of Alan Fullmer at ¶¶14-17, attached as Exhibit B.    Each of the 30,611 emails was received and processed by ZooBuh in Utah, and each recipient email accounts is hosted on ZooBuh's servers in Utah.  *See id*. at ¶¶ 8, 27.  Thrive "targeted" ZooBuh email account holders in an effort to generate traffic to Thrive's website that, during the time frame in question, was located at "executivewhoswhoform.com" ("**Who's Who Website**").  *See id*. at ¶¶ 13-18, 20-21, 23-27.  Based on Thrive's advertised business model, the Who's Who Website has two possible purposes: 1) to generate sales leads and/or 2) to gather email addresses for email lists.

The Who's Who Website was targeted at "executive and professionals" and designed to gather personal information such as name, address, state, zip code, company name, job title, type of business, email address, and business phone number.  *See id*. at ¶¶ 18-19; Who's Who Landing Page, attached as Exhibit 1 to Fullmer Decl.  Not surprisingly, one of the categories of email lists that Thrive sells is a "Professionals" list.  *See* "Available Lists", http://www.thrivemg.com/email-marketing-available-list.php, attached as Exhibit 9 to Fullmer Decl.  Where Thrive's business is to generate sales leads and email lists, its transmission of at

---

Further, ZooBuh does not have any information about emails sent to account holders of other Utah Internet Service Providers such as XMission, Digis, Comcast, etc.  Given the overall lack of information, the 30,611 emails at issue are likely only a very small representative sample of Thrive's business efforts in Utah.  In fact, Thrive advertises an ability to target email traffic to specific locations and advertises email lists of 10,000,000 email addresses.  *See* "Buy An Email List", Exhibit 7 to Fullmer Decl.

least 30,611 emails into Utah, for the purpose of generating sales leads and email lists,

constitutes substantially and continuously "conducting business" in Utah.  This Court has general

jurisdiction over Thrive.

**B.  The Court has Specific Jurisdiction over Thrive.**

An "evaluation of specific jurisdiction in Utah mandates a three-part inquiry: '(1) the

defendant's acts or contacts must implicate Utah under the Utah long-arm statute; (2) a 'nexus'

must exist between the plaintiff's claims and the defendant's acts or contacts; and (3) application

of the Utah long-arm statute must satisfy the requirements of federal due process.'" *Soma Med.

Int'l*, 196 F.3d at 1297 (citing *National Petroleum Mkt'g, Inc. v. Phoenix Fuel Co.,* 902 F.Supp.

1459, 1465 (D. Utah 1995));  *see also Far West Capital, Inc.*, 46 F.3d at 1074.

The Utah Supreme Court frequently makes "a due process analysis first because any set

of circumstances that satisfies due process will also satisfy the long-arm statute."  *Soma Med.

Int'l,* 196 F.3d at 1298. (citing *SII MegaDiamond, Inc. v. American Superabrasives Corp.,* 969

P.2d 430, 433 (Utah 1998)); *see also Far West Capital, Inc.,* 46 F.3d at 1075 (proceeding

directly to constitutional analysis).

1.  <u>Due Process (i.e. Minimum Contacts) is Satisfied.</u>

Due process dictates that a "court may exercise personal jurisdiction over a nonresident

defendant only so long as there exist 'minimum contacts' between the defendant and the forum

state." *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 291, 100 S.Ct. 559, 62

L.Ed.2d 490 (1980) (quoting *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct.

154 (1945)).  It is well established that "different results should not be reached simply because

business is conducted over the internet." *Fenn v. Mleads Ent. Inc.*, 2006 UT 8, ¶ 12, 137 P.3d

706, 711 (Utah 2006) (citing *Zippo Mtg. Co. v. Zippo Dot Com, Inc.*, 952 F.Supp. 1119, 1124

(W.D.Pa. 1997)).  Therefore, for purposes of specific jurisdiction analysis electronic contact and

activity is considered the same as "brick and mortar" business activity.

    The minimum contacts necessary to establish specific personal jurisdiction exists in at

least two circumstances: 1) "if the defendant has purposefully directed his activities at residents

of the forum and the litigation results from alleged injuries that arise out of or relate to those

activities" or 2) "when the nature and quality of the activity is generally of such a degree to

support the exercise of jurisdiction."  *Soma Med. Int'l* 196 F.3d at 1298 ; *Fenn*, 2006 UT 8, ¶ 15.

Here, both circumstances are satisfied.

    Courts who have determined personal jurisdiction primarily on the basis of Internet

activity have concluded "that '[d]ue process is only satisfied based on the 'quality and nature of

the activity' for each individual defendant." *Fenn*, at ¶ 15 (citing *MSF Series Trust III v.

Grainger*, 2004 UT 61, ¶11, 96 P.3d 927).  The "quality and nature" analysis looks to whether

the company engages in "'knowing and repeated transmission of computer files over the

Internet.'  If so, the Internet activity is 'active' under the due process analysis and satisfies

minimum contacts." *Fenn*, at ¶ 16 (citing *Zippo*, 952 F.Supp. at 1124).  Transmission of

computer files includes the transmission of emails.  To this point, the Court in *Fenn* recognized

that "emails, merely through their nature and quality, may rise to the level that creates a

substantial connection between the defendant and Utah."  *Id*. at ¶ 17.  This is precisely the

situation Thrive created in sending its emails to ZooBuh in Utah.

    As set forth in Section I(A) herein, Thrive, either directly or through its agents,

knowingly sends thousand, if not millions, of emails over the Internet in an effort to generate

10

sales leads and create emails lists that it later sells.  In this case, the transmission of emails into

Utah was "repeated" as Thrive sent at least 30,611 emails, each email constituting a different

Internet transaction, to ZooBuh's mail servers in Utah.  *See* Fullmer Decl. at ¶¶ 12-17; *see*

*Melaleuca, Inc. v. Hansen*, 2008 WL 2788470, *5 (unpublished) (finding "purposeful availment"

where defendant only sent "over one hundred e-mails . . . .").  Though Thrive claims ignorance

as to the location where its emails are sent, such ignorance is irrelevant as the "knowing"

analysis does not "permit corporations to hide behind the excuse of ignorance in not knowing

where they or their agents send email[s]. . . ."  *Fenn* at ¶ 17.  In other words, if the company

knowingly engages in repeated transmission of computer files (i.e. emails) over the internet,

which Thrive admittedly does, it does not matter whether the company actually knows where the

Internet transmissions are taking place.  *See id*.  In other words, failing to know where your

commercial email is sent still constitutes "knowing" under the law.

Importantly, Thrive boast of its ability to "target" specific recipients by location, and

offers "Free Targeting" by "geographic locations . . . ."  *See* "Email Marketing", Exhibit 8 to

Fullmer Decl.   Based on Thrive's own admission, it has the ability to target, and in this case,

appears to have targeted the emails in question to ZooBuh's servers in Utah.

The content and purpose of the emails is to direct the email recipients to Thrive's Who's

Who Website.  *See* Fullmer Decl. at ¶¶ 13-17.  The Who's Who Website gathers personal

information of the email recipient (i.e., in many cases Utah residents) and transmits the

information to Thrive.  *See id*. at ¶¶ 18-19; Who's Who Landing Page, Exhibit 1 to Fullmer Decl.

This is the business of generating sales leads and email lists.  Based on Thrive's stated business

model, it then sells the sales leads and email lists to its end-user customers.  *See*, *supra*, Section

11

I(A).  There is no evidence to suggest that Thrive does not have any customers in Utah.  But even if it doesn't, it is still established that Thrive conducts business in Utah by targeting Utah residents with thousands of emails in an attempt to identify the Utah residents as sales leads or email addresses that it later sells.  Thrive's business efforts has a direct effect on Utah residents.

Even if no Utah residents responded to Thrive's emails or ended up as sales leads or on email lists, the Court still has personal jurisdiction over Thrive based on Thrive's attempts to target Utah residents with its emails and by its sending mass emails to ZooBuh account holders.  As stated by the Court in *Fenn*, "[i]t is conceivable . . . that sending mass emails into Utah, or even a threatening or otherwise tortious individual email, may result in a substantial connection between the defendant and Utah if the nature and quality is such as to have a meaningful impact on Utah and its citizens."  *Fenn* at ¶ 17.  Moreover, it is worth noting that at least one of the publishers used by Thrive to send its emails to ZooBuh is located in Utah and identifies itself as Inbox Mail Server 105 S. State St. #129 Orem, UT 84058 United States.  *See* Fullmer Decl. at ¶¶ 29-33.

Each of the 30,611 emails targeted at ZooBuh account holders was received and processed by ZooBuh in its Utah data and storage facility.  *See id*. at ¶¶ 12-17.  Each of the recipient's email accounts is hosted on ZooBuh's servers in Utah.  *See id*. at ¶ 8.  As set forth in ZooBuh's corrected Second Amended Complaint (which allegations must be accepted as true and all reasonable inferences to be drawn from those facts must be made in the light most favorable to Plaintiffs), ZooBuh suffered actual harm, in Utah, as the result of its receipt Thrive's 30,611 emails.  *See* corrected 2d Am. Cmplt. at ¶¶ 41-42, 46-57; *see Pohl, Inc. of Am. v. Webelhuth*, 2008 UT 89, ¶ 2, 201 P.3d 944.

Further, the facts of this action are legally indistinguishable from the facts in *Better Broadcasting*, where this Court found that ZooBuh suffered real harm as the result of its receipt of commercial emails during the time frame of many of the Thrive emails at issue in this case (i.e. mid 2011). *See Better Braodcasting*, 2013 WL 2407669, *1, *4 ("The harm ZooBuh suffered [(i.e. between Feb. 2011 and Nov. 2011)], and continues to suffer, is manifested in financial expense and burden; lost time; lost profitability; decreases in the life span of ZooBuh's hardware; server and bandwidth spikes; server crashes; and pre-mature hardware replacements."). Accordingly, Thrive's actions in sending mass emails into Utah had a meaningful impact on ZooBuh, a Utah company, and a substantial connection exists.

In summary, Thrive engaged in knowing and repeated transmission of computer files over the Internet, at least 30,611 of which were sent to Utah and directly harmed ZooBuh, a Utah business. Thrive's Internet activity in Utah is "active" under the due process analysis and, the nature and quality of Thrive's Internet activity is of such a degree to support the exercise of jurisdiction. Further analysis is unnecessary. *Arguendo*, this litigation, which arises under the CAN-SPAM Act, directly relates to ZooBuh's unwanted receipt of Thrive's unlawful commercial emails, which Thrive targeted at ZooBuh. Accordingly, Thrive has purposefully directed its activities at residents of Utah, and the litigation results from alleged injuries that arise out of or relate to Thrive's activities. Due process permits the Court to exercise specific jurisdiction over Thrive.

2. The Requirements of Utah's Long Arm Statute are Satisfied.

Utah's long-arm statute was enacted "to ensure maximum protection to citizens of this state, [and] should be applied so as to assert jurisdiction over nonresident defendants to the

fullest extent permitted by the due process clause of the Fourteenth Amendment to the United

States Constitution." Utah Code Ann. § 78B-3-201(3) (2012).  Indeed, Utah's laws explicitly

recognize that the long-arm statute is "necessary because of technological progress which has

substantially increased the flow of commerce between the several states resulting in increased

interaction between persons of this state and persons of other states." *Id.* at § 78B-3-201(2).

Utah's long-arm statute provides in pertinent part as follows:

any person or personal representative of the person, whether or not a citizen or resident of this state, who, in person or through an agent, does any of the following enumerated acts is subject to the jurisdiction of the courts of this state as to any claim arising out of or related to:

(1) the transaction of any business within this state; . . .
(3) the causing of any injury within this state whether tortious or by breach of warranty;

Utah Code Ann. § 78B–3–205. The long-arm statute must be interpreted broadly "so as to assert

jurisdiction over nonresident defendants to the fullest extent permitted by the due process clause

of the Fourteenth Amendment to the United States Constitution." § 78B-3-201; *see also*

*Starways, Inc. v. Curry,* 980 P.2d 204, 206 (Utah 1999) ("We have held that the Utah long-arm

statute 'must be extended to the fullest extent allowed by due process of law.'") (quoting

*Synergetics v. Marathon Ranching Co.,* 701 P.2d 1106, 1110 (Utah 1985)).

The long-arm statute itself defines the transaction of business broadly, as "activities of a

non-resident person, his agents, or representatives in this state which affect persons or businesses

within the state" of Utah.  Utah Code Ann. § 78B-3-202(2). "These words are liberally and

expansively interpreted such that 'a person may transact business within the state despite an

absence of physical presence in Utah.'" *Hafen*, 338 F. Supp. 2d at 1260 (quoting *Nova Mud*

*Corp. v. Fletcher*, 648 F. Supp. 1123, 1126 (D. Utah 1986)). Furthermore, in interpreting the

tortious injury requirement in Utah's long-arm statute, the Utah Supreme Court has ruled that "the plain language of the long-arm statute does not exclude financial injuries caused by tortious actions." *Pohl*, 2008 UT 89, ¶ 19.

For all the reasons set forth in Section I(B)(1), Thrive transacts business in Utah and has caused injury within the state of Utah.  In this case, the elements satisfying the Due Process requirement of personal jurisdiction also satisfy the long-arm statute.  *See Soma Med. Int'l,* 196 F.3d at 1298. (citing *SII MegaDiamond, Inc. v. American Superabrasives Corp.,* 969 P.2d 430, 433 (Utah 1998)).

3.   <u>There is a Direct Nexus Between Thrive's Actions and ZooBuh's Claims.</u>

In Thrive's Memo. it presents a three factor test that it argues is used to determine whether there is a "nexus" between the defendant's action and the plaintiff's injury sufficient to satisfy personal jurisdiction over the defendant.  *See* Memo. at p. 11.  As the source of the three factor test, Thrive cites the unpublished opinions in *Grynberg v. Ivanhoe Energy, Inc.*, and *Miche Bag, LLC v. Cook*.  However, neither of these cases actually presents the three factor test as part of a "nexus" analysis.  In fact, the three factor test is not related to "nexus" at all, rather it presents a separate basis upon which due process may be satisfied.  The three factors originated from *Dudnikov v. Chalk & Vermilion Fine Art, Inc.*, 514 F.3d 1063 (10th Cir. 2008) and *Calder v. Jones*, 465 U.S. 783 (1984) and is often referred to as the *Dudnikov* test.  Neither *Dudnikov* nor *Calder* even address "nexus."  They are purely due process cases.

Tellingly, *Grynberg* identifies the *Dudnikov* test as only "one way to conduct" a due process analysis.  *Grynberg*, 490 Fed.Appx.86, *96 (unpublished), attached as <u>Exhibit C</u>.  Of course, the Court need not analyze the *Dudnikov* test in this case as due process is satisfied based

on both the *Soma* and *Fenn* tests analyzed in detail in Section I(B)(1) herein.  In short, the Court

is so concerned with providing a local plaintiff an ability to bring claims in its own state that it

has created many tests to satisfy the due process requirements.

With respect to "nexus," the analysis is simple.  In fact, most cases do not even analyze

"nexus" in providing a personal jurisdiction analysis.  "Nexus" simply requires that there be

some connection between the defendant's action and the plaintiff's injury that is not too remote.

*See Soma*, *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472, 105 S. Ct. 2174, 2182 (1985).  In

other words, plaintiff's injuries must "arise out of or relate to [Defendant's] activities."  *Pro

Axess, Inc. v. Orlux Dist. Inc.*, 428 F.3d 1270, 1278-79 (10th Cir. 2005) (citing *Burger King* at

472).  This element is easily satisfied in this case and was fully addressed in the due process

analysis above.  *See*, *supra,* Section I(B)(1).

As set forth above, each of the 30,611 emails targeted at ZooBuh account holders was

received and processed by ZooBuh in Utah.  *See* Fullmer Decl. at ¶¶ 8, 12-17.  Each of the

recipient's email accounts is hosted on ZooBuh's servers in Utah.  *See id*. at ¶ 8.  ZooBuh

suffered actual harm, in Utah, as the result of its receipt Thrive's 30,611 emails.  *See* corrected

2d Am. Cmplt. at ¶¶ 41-42, 46-57; *see also Pohl, Inc. of Am. v. Webelhuth*, 2008 UT 89, ¶ 2, 201

P.3d 944 (Plaintiff's allegations must be accepted as true and all reasonable inferences to be

drawn from those facts must be made in the light most favorable to Plaintiffs).

The injury of which ZooBuh complains, and which gives rise to this lawsuit, is the direct

result of Thrive's internet marketing efforts in Utah.  Simply put, there is a direct nexus between

the claims and injury as the injury directly arises out of Thrive's actions.

II.    THE FAIRNESS FACTORS FAVOR JURISDICTION OVER THIS MATTER
       IN UTAH.

If the defendant's activities create sufficient minimum contacts, which is the case here,

the Court then considers "whether the exercise of personal jurisdiction over the defendant

offends 'traditional notions of fair play and substantial justice.'"  *Soma Med.* Int'l, 196 F.3d at

1298.  "[I]n other words, the exercise of jurisdiction must be fair and reasonable.  Generally,

under the reasonableness factor, a court weighs and balances a variety of interests, including the

inconvenience to the plaintiff and to the defendants, the regulatory concerns of the forum state,

and the location of the witnesses and evidence."  *Fenn*, 2006 UT 8, ¶ 23.  The Court also weighs

"the shared interest of the several states [or foreign nations] in furthering fundamental social

policies."  *Dudnikov*, 514 F.3d at 1080).  Each of these factors favors jurisdiction in Utah.

**A.  Convenience and the Location of Witnesses and Evidence Favors Litigation in
     Utah.**

The convenience to the parties and the location of witness and evidence favors litigation

of this matter in Utah.  Just as Thrive has officers and employees in Tennessee, ZooBuh has its

officers and employees in Utah.  Just as Thrive has its primary operation in Tennessee, ZooBuh

has its primary operation in Utah.  It is unclear how Thrive has taken that the position that simply

because it is in Tennessee "the majority of the witnesses and evidence concerning or related to

the subject matter of the Utah Action and this action . . . are in Tennessee."  *See* Memo. at p 15.

In fact, each of the 30,611 emails at issue in the underlying substantive action is stored on

ZooBuh's servers in Utah, all the evidence relating to the receipt and processing of the emails is

in Utah, all of the witnesses who analyzed the emails and connected them to Thrive are in Utah,

all of the evidence related to ZooBuh's damages and the adverse effects of the emails is in Utah,

and all of the harm alleged in the case occurred in Utah.  *See generally* Fullmer Decl.

Moreover, Thrive is a much larger company than ZooBuh, which is a small, family owned business.  Thrive simply has a better ability to bear the cost of litigation in Utah than ZooBuh would in Tennessee.  Further, where Thrive attempts to use ZooBuh's small, family owned nature, as a sword against ZooBuh re standing, it cannot hide behind this fact in asserting its convenience arguments.  *See Bell Holdings, LLC d/b/a Thrive Marketing Group's Response in Opposition to ZooBuh, Inc.'s Motion to Transfer or Dismiss*, at p. 3, attached as <u>Exhibit "1"</u> to Thrive's Memo.   Notwithstanding, outside of actual witnesses, some of whom may be in Tennessee, the majority evidence supporting the claims in this case appears to be in Utah, or available electronically, which does not impose a burden on either party.

Lastly, Thrive elected to send, either directly or through its marketers, 30,611 emails into Utah through which it inflicted actual and statutory injury on ZooBuh in Utah.  Thus, it can be fairly said that Thrive chose Utah as the forum for litigation through its actions.  Having chosen Utah, any inconvenience to Thrive is of minimal importance.

### B.  The Concern of the Forum State and Public Policy Favor Litigation in Utah.

As a matter of policy, "[a] State generally has a 'manifest interest' in providing its residents with a convenient forum for redressing injuries inflicted by out-of-state actors. Moreover, where individuals 'purposefully derive benefit' from their interstate activities, it may well be unfair to allow them to escape having to account in other States for consequences that arise proximately from such activities."  *Burger King Corp*, 471 U.S. at 473-74 (internal citation omitted).  Thrive's entire business is to purposefully avail itself of its interstate activities.  As already analyzed in Sections I(A) and I(B)(1), Thrive purposefully avails itself of its activities in

Utah by sending mass emails into Utah with the purpose of generating sales leads and email lists to later sell.  This Court should not permit Thrive to escape having to account to the Court in Utah for the consequences that arose as the result of its mass email activity in Utah.

Further, the U.S. District Court in Utah is in a superior position to thoroughly analyze ZooBuh's claims and provide convenient and effective relief (s*ee World-Wide Volkswagen Corp.*, 444 U.S. at 292-93 (1980)) because there is established CAN-SPAM precedent in Utah where no such precedent exists in Tennessee or in the entire 6th Circuit.  In fact, there are only two opinions that even mention the CAN-SPAM Act in the entire 6th Circuit: *Hafke v. Rossdale Group, LLC¸* 2011 WL 4758768 (W.D. Michigan, 2011); and *Madorsky v. DOES*, 2006 WL 1587349 (N.D. Ohio, 2006).  Neither case provides any substantive analysis of the CAN-SPAM Act.  Rather, each case simply states that the CAN-SPAM Act does not provide a private cause of action for an individual.  ZooBuh is not an individual and the aforementioned cases are not helpful or relevant.

Each of the "Fairness" factors supports litigation in Utah.  Accordingly, this Court should deny Thrive's argument and require Thrive to file an Answer to the corrected Second Amended Complaint within 20 days of the Court's ruling on this matter.

## Conclusion

Based on the foregoing, this Court has general jurisdiction over Thrive in Utah.  Further, this Court has specific jurisdiction over Thrive for the claims asserts by ZooBuh in its corrected Second Amended Complaint.  Therefore, this Court should deny Thrive's Motion to Dismiss, exercise jurisdiction over Thrive, and order Thrive to file an Answer in this matter within 20 days of the Court's ruling.

DATED this 11th day of September, 2014.

**DURHAM JONES & PINEGAR, P.C.**

/s/ Evan A. Schmutz _____

Evan A. Schmutz
Jordan K. Cameron
*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on September 11, 2014, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which sent notification of such filing to the following:

Juliette P. White
Parsons Behle & Latimer
201 South Main Street, Suite 1800
Salt Lake City, Utah 84111
*Attorneys for Defendant Bell Holdings, LLC*
*Dba Thrive Marketing Group*

_____/s/ Evan A. Schmutz_____